**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David Michael KELLEY, Defendant–
Appellant.**

**No. 90–50441.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 2, 1991.

Decided Jan. 14, 1992.

Debra Ann DiIorio, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Bruce R. Castetter and Judith S. Feigin, Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Before SCHROEDER and REINHARDT, Circuit Judges, and KING *, Senior District Judge.

SAMUEL P. KING, District Judge:

Appellant David Michael Kelley appeals the use at his jury trial of items recovered from his living quarters without his consent on the ground that either the consent of his female housemate was involuntary or she lacked authority to consent to a search of his bedroom and closet. Kelley also appeals the use of statements taken when he was on the verge of withdrawal from heroin on the basis that they were involuntary.

### Facts

Kelley was arrested on June 9, 1990, as he exited his residence in San Diego, California, accompanied by his housemate, Holly Bakker, and her two young children. At the time of the arrest, Kelley was under FBI surveillance as a suspect in several unsolved robberies in the San Diego area. Following his arrest, Kelley told FBI Agent Walker that Ms. Bakker was his girlfriend.

As Kelley was being arrested, FBI agent John Swartzwelder approached Ms. Bakker and asked her to lie prone on the sidewalk. He had his gun in his left hand, and his right hand was in the center of Ms. Bakk-

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

er's back. Ms. Bakker's two young children were nearby, crying. Agent Swartzwelder informed Ms. Bakker that the Agents were not there to arrest her, while another Agent calmed the children. After Kelley had been placed under arrest and taken into an FBI car, Agent Swartzwelder re-holstered his gun and allowed Ms. Bakker to get up. Agent Swartzwelder then questioned Ms. Bakker about her relationship with Kelley and, approximately fifteen minutes after Ms. Bakker was initially placed on the ground, obtained her written consent to search the residence. Once inside, Ms. Bakker informed Agent Swartzwelder that she and Kelley had rented the apartment three days ago as a purely financial arrangement, that she had signed the rental agreement, that they had separate bedrooms, and that she was allowed access to Kelley's bedroom to use the telephone, which was located on the right-hand side of his room, in the back corner.

During the course of the search, several items were seized from Kelley's closet, which was located in the far left-hand corner of Kelley's bedroom. Items were also seized from a chair in Kelley's bedroom. At the time of the search, the doors to Kelley's bedroom and closet were open.

Kelley was placed under arrest and read his *Miranda* rights before being transported to FBI headquarters where he was again read his rights. Kelley signed a written waiver form waiving those rights and was interrogated for one hour and twenty minutes with one arm handcuffed to his chair. During the questioning, Kelley informed the Agents that he was a heroin addict, with a $200–a–day habit. He told the Agents that at the time of his arrest he was on his way to purchase heroin. He also told them that at some point in the afternoon he would be getting sick due to heroin withdrawal. At the beginning of the interview, Kelley requested, and was given, at least two cups of coffee with extra sugar, to help delay the effects of withdrawal. Approximately two-thirds of the way through the interview, Kelley began to experience cold chills, sweats, shakes, and trembling hands. He was given coffee with an extra amount of sugar so

that he could continue the interview. Kelley told the Agents that they needed to hurry and finish their questioning because of his withdrawal. At some point during the interview, the Agents told Kelley that they would inform the prosecutor and judge of his cooperation.

After the interview was completed, Kelley was transported to the Metropolitan Correctional Center, where he was booked on charges of bank robbery. The booking slip for the MCC stated that Kelley was "going through withdrawal."

Kelley was subsequently charged with six counts of bank robbery, in violation of 18 U.S.C. § 2113(a) and (d). The trial court denied his pretrial motions to suppress post-arrest statements and to suppress evidence seized from his closet. Following a jury trial, Kelley was convicted of three counts of bank robbery. A mistrial was declared as to the remaining three counts.

*Discussion*

I. *District Court's Denial of Kelley's Motion to Suppress Post–Arrest Statements*

Kelley contends that his post-arrest statements were involuntary and therefore should have been suppressed by the trial court. Voluntariness is a legal question requiring *de novo* review. *United States v. McConney,* 728 F.2d 1195 (9th Cir.1984); *United States v. Wilson,* 838 F.2d 1081 (9th Cir.1988). The voluntariness of a confession must be established by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

A voluntary statement is one that is the product of a rational intellect and free will. *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). No one factor is determinative. Instead, the "totality of the circumstances" must be considered. *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *Mincy v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973).

This includes both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973).

### A. *Characteristics of the Accused*

 Kelley argues that the fact that he was on the verge of heroin withdrawal renders his post-arrest statements involuntary. A statement may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect and a free will. *Gladden v. Unsworth,* 396 F.2d 373, 380–81 (9th Cir.1968).

In *United States v. Lewis,* 833 F.2d 1380 (9th Cir.1987), statements taken in a hospital several hours after the defendant was administered a general anesthetic were held to be voluntary, based on a government agent's sworn statement that the defendant said she was feeling "o.k." and evidence that showed that the defendant was alert, answered the agent's questions responsively, and was able to recall past events accurately. *Id.* at 1384–5. In *United States v. Martin,* 781 F.2d 671 (9th Cir.1985), statements made by defendant in the hospital while in pain and under the influence of Demerol, a pain-killing medication, were again held to be voluntary. There, defendant was groggy from medication but coherent, able to conduct a continuous conversation, able to make eye contact, the medication was not excessive or unusual, and defendant's injuries, though painful, "did not render him unconscious or comatose." *Id.* at 674. In *Medeiros v. Shimoda,* 889 F.2d 819 (9th Cir.1989), defendant made a voluntary statement where, although intoxicated, he was able to drive an automobile, obey the orders of officers prior to and during an initial stop, and cooperate in conversing with them. *Id.* at 823.

Kelley began to display physical signs of withdrawal approximately two-thirds of the way through the interview. At that point, he began experiencing chills, shaking, and trembling. Despite this, Kelley remained coherent and responsive, was aware of what was going on, and told the FBI agents that he was able to continue with the questioning. He was able to distinguish between the various bank robberies about which he was being questioned, and told the agents that they needed to hurry if they wanted to continue the interrogation. These facts indicate that the effects of withdrawal did not overcome Kelley's ability to think rationally.

### B. *Details of the Interrogation*

 Coercive policy activity is "a necessary predicate" to finding a confession involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986). Examples of overreaching include lengthy questioning, deprivation of food or sleep, and physical threats of harm. *Id.* at 164, n. 1, 107 S.Ct. at 520, n. 1. Also included are forms of psychological persuasion. *Id.* at 164, 107 S.Ct. at 520. There must be some causal connection between the police conduct and the confession. *Id.*

The circumstances of Kelley's interrogation do not rise to the level of overreaching necessary to support a finding of police coercion. Although Kelley was handcuffed during the interrogation, he was never threatened with physical harm if he failed to make a statement. Nor is an interrogation of one hour and 20 minutes unduly protracted. Although the interrogation did continue for approximately 30 minutes after Kelley began to exhibit physical signs of withdrawal, he remained coherent and oriented throughout this time. Therefore, continuing the interrogation was not unduly coercive. The fact that Kelley was told that his cooperation would be communicated to the prosecutor and judge also does not rise to the level of psychological coercion.

The preponderance of the evidence shows that Kelley's ability to think rationally was unimpaired by his being on the verge of heroin withdrawal during part of the interrogation. The preponderance of the evidence also shows that no coercive police activity occurred during the interrogation. Therefore, the trial court did not err in

denying Kelley's motion to suppress post-arrest statements.

## II. *District Court's Denial of Kelley's Motion to Suppress Evidence*

Kelley argues that evidence seized from his room and closet should have been suppressed either because his housemate's consent was involuntary or because his housemate lacked the authority to consent to a search of his room and closet.

### A. *Voluntariness*

▮ The voluntariness of a consent to search is reviewed for clear error. *United States v. Iglesias*, 881 F.2d 1519 (9th Cir.1989), *cert. denied*, 493 U.S. 1088, 110 S.Ct. 1154, 107 L.Ed.2d 1057 (1990). The court determines the voluntariness by considering the totality of the surrounding circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

▮ Kelley argues that Ms. Bakker's consent was involuntary because prior to consenting she had been ordered by an armed FBI agent to lie prone on the ground while her children were crying and running about nearby. However, Ms. Bakker gave her consent after Agent Swartzwelder had informed her that she was not being arrested, allowed her to rise from the sidewalk, re-holstered his gun, and her children were calm and no longer crying. The time between Ms. Bakker's being ordered to the ground and Ms. Bakker's consenting to the search was approximately fifteen minutes.

In light of the length of time that elapsed between Ms. Bakker first being ordered to the ground and her subsequent consent to the search, during which time an admittedly frightening situation had been defused, the trial court's finding that Ms. Bakker's consent was voluntary was not clearly erroneous.

### B. *Authority*

We have left open the question of whether the existence of authority to consent is reviewed *de novo* or for clear error. *United States v. Valencia–Roldan*, 893 F.2d 1080 (9th Cir.), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2181, 109 L.Ed.2d 509 (1990). We need not resolve that issue here, as the same conclusion results under either standard.

▮ Consent to a search may be given by a third party who possesses common authority over, or other sufficient relationship to, the premises to be inspected. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). *United States v. Yarbrough*, 852 F.2d 1522, 1534 (9th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988). The common authority justifying the consent need only rest "on the mutual use of the property by persons having joint access or control for most purposes...." *United States v. Sealey*, 830 F.2d 1028, 1031 (9th Cir.1987), citing *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7.

▮ As the trial court specifically found, Ms. Bakker had rented the apartment together with Kelley, had signed the lease, and informed Agent Swartzwelder that she and Kelley were roommates. Although it is more accurate to say that Ms. Bakker and Kelley were housemates rather than roommates, in that they did not share a bedroom, Ms. Bakker did have joint access and control, for most purposes, of the residence she shared with Kelley, which was the premises to be searched. She had access not only to the common areas of the apartment, but also to Kelley's separate bedroom where the apartment telephone was located. Combined, this evidence is sufficient to support the trial court's finding that Ms. Bakker had authority to consent to a search of Kelley's bedroom, including his closet, under either standard of review.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

The majority's opinion does a serious disservice to Fourth Amendment privacy interests. The majority displays no awareness of the reality of modern living arrangements in which friends or acquaint-

ances routinely share houses and apartments in order better to afford the high cost of rent. In fact, such arrangements are prevalent among students, new entrants in the workforce, and unmarried working- and middle-class individuals. Even married couples sometimes are forced by economic necessity to share living quarters with others. The majority ignores these realities, as well as the applicable law, and blithely plunges ahead to uphold a search of one housemate's bedroom on the basis of a wholly ineffective "consent" granted by another. In doing so, my colleagues sorely misperceive a critical aspect of Fourth Amendment law that is dispositive of the present case. Specifically, the majority refuses to acknowledge that a third party cannot validly grant consent to a search of her housemate's private living quarters unless she has "joint access and control for most purposes" of *those living quarters*. The law is clear: joint access to the common areas of a shared house or apartment is *not* sufficient, even when coupled with limited access to the housemate's quarters.

The facts relevant to the authority of Holly Bakker to consent to a search of David Kelley's bedroom are relatively straightforward. The police arrested Mr. Kelley, the appellant, as he exited his residence with Ms. Bakker. The police then took Mr. Kelley, but not Ms. Bakker, to FBI headquarters. Mr. Kelley did not give the police his consent to search his bedroom. After Mr. Kelley had been taken away, the police asked Ms. Bakker for consent to search his bedroom and the rest of

the residence. Approximately fifteen minutes later, after some discussion between the police and Ms. Bakker, Ms. Bakker consented to the search. During the search, the police seized items located in Mr. Kelley's bedroom closet and on a chair in his bedroom. These items were introduced at Mr. Kelley's trial over his objection that they were obtained in the course of an illegal search and seizure.

As the district court found, because Mr. Kelley did not consent to a search of his residence, the only possible basis for the FBI's warrantless search of his bedroom was the authority of Ms. Bakker to authorize it. The district court found that Ms. Bakker had the authority permit the police to search Mr. Kelley's bedroom based on three—and only three[1]—findings of fact: (1) that Ms. Bakker stated that she had signed the lease for the apartment; (2) that Ms. Bakker stated that she had access to the apartment; and (3) that Ms. Bakker stated that although she and Mr. Kelley had separate bedrooms, she had access to his bedroom for the purpose of using the one telephone in the apartment (located in the corner of his bedroom).[2]

The question, then, is whether the facts that Ms. Bakker signed the lease, had general access to the common areas of the apartment, and had highly limited access to Mr. Kelley's bedroom are by themselves sufficient as a matter of law to support a finding that Ms. Bakker had the authority to authorize the police to engage in a warrantless search of Mr. Kelley's bedroom and its effects. The standard that governs

---

1. Although in its statement of facts the majority asserts that "[f]ollowing his arrest, Kelley told FBI Agent Walker that Ms. Bakker was his girlfriend," opinion at 563, the district court did not find or rely on this "fact." Nor is the majority opinion based to any degree on the purported relationship between Mr. Kelley and Ms. Bakker; to the contrary, both the district court and the majority concluded that Mr. Kelley and Ms. Bakker had separate bedrooms, and that her access to his bedroom was for an extremely limited purpose only—to use the telephone.

2. As the majority concedes, Ms. Bakker informed the police that she had been housemates with Mr. Kelley for only *three days* prior to her

"consent" to the warrantless search of his bedroom. *See* Opinion at 464. She also told the police that the phone had been installed just *one day* prior to Mr. Kelley's arrest and her "consent" to the police search of his bedroom. Indeed, Ms. Bakker also said that she merely *assumed* that she had permission to enter Mr. Kelley's bedroom in order to use the phone: she stated that she had not yet used it, had not yet discussed the issue with Mr. Kelley, and *had not yet been in Mr. Kelley's room for any reason whatsoever*. Ms. Bakker's "access" to Mr. Kelley's room therefore was not only contingent on a particular, limited function—use of the telephone—but also was completely hypothetical and unrealized.

that inquiry is clear: the Supreme Court repeatedly has held that third party consent to such an intrusive police procedure is constitutionally valid only when the third party has "joint access or control *for most purposes*" over the quarters to be searched. *Illinois v. Rodriguez*, —— U.S. ——, 110 S.Ct. 2793, 2797–98, 111 L.Ed.2d 148 (1990) (emphasis added); *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974).

There is no question that the first two facts—lease status and general access to the common portions of the property—constitute a legally insufficient basis upon which to authorize a warrantless search of Mr. Kelley's private living quarters. *See, e.g., United States v. Heisman*, 503 F.2d 1284, 1288 (8th Cir.1974); *see also Chapman v. United States*, 365 U.S. 610, 616–17, 81 S.Ct. 776, 779–80, 5 L.Ed.2d 828 (1961) (holding that a landlord cannot validly consent to a search of a tenant's apartment despite ownership and legal authority to enter the premises). Our court previously has stated explicitly that the mere status of housemate is insufficient to confer on a person the ability to authorize a police officer to search his or her housemate's bedroom. *See Cunningham v. Heinze*, 352 F.2d 1, 4 (9th Cir.1965), *cert. denied*, 383 U.S. 968, 86 S.Ct. 1274, 16 L.Ed.2d 309 (1966). The issue in the present case is simply whether the addition of the third fact—the ability to use a telephone located in the housemate's bedroom—suffices to transform what undisputably would be an invalid consent into a lawful authorization of a warrantless search. The answer is clearly, "no."

In order to conclude that Ms. Bakker could lawfully consent to a police search of Mr. Kelley's bedroom, it would be necessary to find that she had "joint access or control *for most purposes*" over the premises to be searched. One who has been granted permission to enter a room solely for the purpose of using the telephone certainly does not have "joint access or control *for most purposes*" over that area. The majority opinion cites no precedent that in any way suggests or supports a contrary result. Indeed, no reported federal opinion has *ever* held that third party consent is valid in a situation such as the one presented here.

The majority makes a passing reference to the applicable test by way of a one-sentence conclusion that Ms. Bakker "had joint access and control, for most purposes, of the residence she shared with Kelley, which was the premises to be searched." Opinion at 566. That statement is puzzling at best. Ms. Bakker undoubtedly had joint access "for most purposes" to her own room and to the common areas of the apartment, and hence could validly consent to a search of those places. However, for purposes of this appeal, those portions of the apartment are not the "premises to be searched." The disputed area was Mr. Kelley's bedroom and bedroom closet, not Ms. Bakker's bedroom or the common areas of the apartment.[3] It is the disputed portion of the premises which could not be searched in the absence of "joint access or control for most purposes" over them by Ms. Bakker. Mr. Kelley's privacy interest in his bedroom is not diminished by the fact that Ms. Bakker had access to other areas of the apartment; similarly, the police may not search a bedroom merely because *other* areas of the apartment may lawfully be searched. Precedent makes clear that Ms. Bakker could validly consent to a warrantless search of Mr. Kelley's bedroom only if she had "joint access and control for most purposes" over the bedroom itself. *See Cunningham*, 352 F.2d at 4–5 (noting that the validity of consent is analyzed according to the particular area to be searched and the extent of the housemate's access to that particular area); *see also Heisman*, 503 F.2d at 1288 (holding consent invalid when a housemate had unlimited access to the common areas of the apartment but

---

**3.** The police found no incriminating evidence in the common areas of the apartment or in Ms. Bakker's bedroom. The evidence seized by the police was taken exclusively from Mr. Kelley's bedroom and from his bedroom closet. Mr. Kelley does not contest the authority of Ms. Bakker to consent to a police search of the common areas—he claims only that Ms. Bakker lacked authority to permit the police to search his bedroom and closet.

only limited access to her housemate's bedroom). The majority blatantly ignores these cases, as well as the other cases discussed below.[4]

Based upon the facts of this case and the district court's findings, it is undeniable that Ms. Bakker did not have joint access or control *for most purposes* over Mr. Kelley's bedroom, regardless of her access to other areas of the apartment which the police also searched. Ms. Bakker's single purpose access is analogous to precedents involving a landlord who purports to grant consent to a search of his tenant's property despite the fact that he has access only for the limited purpose of making repairs or retrieving personal property from the garage. *See United States v. Warner*, 843 F.2d 401 (9th Cir.1988); *United States v. Impink*, 728 F.2d 1228 (9th Cir.1984); *see also Cunningham*, 352 F.2d at 4–5 (reversing conviction because "appellant alleges that the bedroom closet and effects it contained were his, and that he had not voluntarily shared their control with Mrs.

Schmidt.... Even if Mrs. Schmidt had express or implied authority to enter appellant's bedroom for housekeeping purposes, it would not follow that she could permit a police search of appellant's room, closet, and effects.").[5] The limited purpose cases uniformly reject the purported consent, because a person with limited purpose access lacks the "joint access and control for most purposes" necessary under *Rodriguez* and *Matlock*.[6]

The present case is quite similar to *United States v. Heisman*, 503 F.2d 1284 (8th Cir.1974). *Heisman* held that one co-tenant could not validly consent to a search of the other co-tenant's bedroom even though both tenants had signed the lease, both tenants had keys to the apartment, and the co-tenant purporting to grant the consent had previously entered the bedroom to be searched. *See id.* at 1288. In *Heisman*, "[a]lthough there was no door or lock to Heisman's room, it was nevertheless an area set aside for his own private use.

4. An interpretation of the phrase "premises to be searched" as encompassing the *entire* residence would lead to patently absurd results. If the test is general access to the common areas of the apartment regardless of the restrictions on access to private living quarters, then whether or not Ms. Bakker had *any* access to Mr. Kelley's bedroom would be irrelevant. Under that construction, an individual could authorize the police to search areas to which he had *no* access as long as the entire area to be searched was sufficiently expansive so that he had joint access to "most" of it. Clearly, the majority, which relies on Ms. Bakker's "access" to Mr. Kelley's bedroom, does not intend to take that position. Nor did the district court. Both considered the question of Ms. Bakker's access to Mr. Kelley's bedroom to be important.

5. The majority does not explain how Ms. Bakker's hypothetical access to the telephone in the far left corner of Mr. Kelley's bedroom somehow imbued her with the authority to permit the police to rummage through Mr. Kelley's *closet*, which was located on the far right side of the bedroom and to which Ms. Bakker had *no* access. Because I would hold that Ms. Bakker did not validly consent to the police search of Mr. Kelley's bedroom, I similarly would hold that she did not validly consent to a search of Mr. Kelley's bedroom closet. Thus, I need not consider the question of the closet separately, although the answer to that question would be equally clear even in the event that Ms. Bakker had sufficient access to the bedroom itself.

6. In *United States v. Sledge*, 650 F.2d 1075, 1080 n. 10 (9th Cir.1981), we stated in dicta that if a third party has limited access to the defendant's premises, and that limited access is sufficient to allow the plain view discovery of the incriminating evidence, then the third party may consent to allow the police to stand in his place. Regardless of the validity of that proposition, the evidence discovered in Mr. Kelley's closet was not in plain view of someone entering the bedroom to use the telephone. Nor, in fact, is there any evidence that the objects seized were in plain view of someone standing in front of the open closet door. Thus, the plain view principle is inapplicable.

The same footnote in *Sledge* also stated in dicta that other precedents had "implied that a defendant may assume the risk that the third party will at times exceed the scope of authorized access, as that is defined in precise and narrow terms." That implication is far from obvious in the cases cited to support it, and in any event goes no further than tolerating minor deviations from narrowly prescribed uses. Even if we could conclude that Mr. Kelley had assumed the risk that Ms. Bakker would linger in his bedroom or wander around it while talking on the phone, we cannot reasonably conclude that by authorizing her to make telephone calls he had assumed the risk that she would rummage through his closet or grant consent to others to do so. Accordingly, the assumption of risk principle is inapplicable as well.

[The co-tenant] had only been in the room once and then with Heisman's permission. As a practical matter, Keterson did not have access or control of Heisman's room for *any* purpose." *Id.* (emphasis in original).

Cases which have upheld a third party's consent have all found that the consenter's access to the premises was equal to or greater than that of the person asserting a privacy interest. In *United States v. Guzman*, 852 F.2d 1117 (9th Cir.1988), for instance, we held that a wife who leased her husband's apartment, sometimes stayed there, possessed a key, and stored clothes and makeup there had the authority to consent to a search of the apartment. In *Guzman*, we specifically stated that the husband had produced no evidence that the wife's access to the apartment was limited. Similarly, in *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir.), *cert. denied*, 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988), we upheld the consent given by the owner of a shack who had permitted the defendant to stay there for one month. We noted that the shack had only one habitable room, that both the defendant and the owner left personal property in that room, and that the defendant had a key to the shack. In *Yarbrough*, we stated that the owner "had complete access throughout the property in general, and to the room lived in by [the defendant] in particular. It was as much his own place as it was [the defendant's]." *Id.* at 1534. *See also United States v. Sealey*, 830 F.2d 1028 (9th Cir.1987) (holding that a wife validly consented to a search of the garage when she was married to the defendant, was part owner of the home, and had "unlimited access to all areas"); *United States v. Hamilton*, 792 F.2d 837 (9th Cir.1986) (holding that the defendant's mother validly consented to a search of a motor home parked in the driveway of her house when the motor home was connected by an electrical cord to her house, the mother was observed entering the motor home repeatedly, and the mother apparently had supervisory authority over two teenage girls who were inside the motor home because it was reasonable to conclude that the mother had common authority over the motor home sufficient to give valid consent). There is, however, no reported federal decision which has upheld the granting of consent by a person with limited access such as was enjoyed by Ms. Bakker in the present case.

Under well-established law, Ms. Bakker could not give valid consent to a search of Mr. Kelley's bedroom. Her relationship to that room was far too insubstantial. It would be well to remember that "[t]he rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or unrealistic doctrines of 'apparent authority.'" *Stoner v. California*, 376 U.S. 483, 488, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964). Because the majority ignores that admonition, fails to construe our precedent properly, and gives voice to concepts that are inconsistent with the mandate of the Fourth Amendment, I respectfully dissent.