51 F.3d 283
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee
v.
Alfred ELWOOD Walking Eagle, Jr., Defendant-Appellant.
 No. 94-30169.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 10, 1995.
Decided March 27, 1995.
 
 Before: PREGERSON, KOZINSKI, and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Alfred Elwood Walking Eagle, Jr. ("Walking Eagle") was convicted of first degree murder in violation of 18 U.S.C. Secs. 1111, 1153. Walking Eagle was sentenced to serve a life term under 18 U.S.C. Sec. 1111(b). He appeals both his conviction and his sentence. We have jurisdiction over this appeal under 28 U.S.C. Sec. 1291. We affirm.
 
 I. BACKGROUND
 
 3
 Walking Eagle was arrested on April 3, 1993, on the tribal charge of theft and booked into the Bureau of Indian Affairs ("BIA") Jail in Poplar, Montana. After his arrest, the FBI was notified of a dead body found north of Poplar. BIA Officer Four Bear told the FBI that Walking Eagle might have some information about the body.
 
 
 4
 At approximately 8:00 p.m., FBI Agent Cruse and BIA Officer Boyd questioned Walking Eagle about the report he had made to Officer Four Bear. Walking Eagle told the officers that he saw something shining in a coulee near the road, and upon investigation, he learned it was a body. He told the officers that the body looked like someone who was an acquaintance of Buddy Baker. The officers then left Walking Eagle to continue the investigation.
 
 
 5
 During the course of the investigation, the officers interviewed Carlene Lester, who identified the body as Thomas Jeno. Lester said that Jeno and Walking Eagle had been living with Donald Walking Eagle. The officers then retrieved Alfred Walking Eagle's clothes from the jail and noticed blood on his clothing. Agent Cruse then heard that a van belonging to Carl Lambert had been seen near the area where the body was found. Cruse searched the van with Carl's consent and found blood in the cargo area. Carl told Cruse that William Lambert and Walking Eagle had used the van the day before. Cruse, joined by BIA Agent Boyd and FBI Agent Wixson, interviewed Wiliam Lambert.
 
 
 6
 William Lambert told the officers that he, Walking Eagle, and Jeno were together the night Jeno was killed. The three were riding together in the van, and Lambert stopped to get some beer. While he was in the store, Walking Eagle and Jeno began to argue. When Lambert returned, the three decided to drive to a place north of Poplar to drink the beer. During the drive, Jeno kicked the back of Walking Eagle's seat, making him angry. Walking Eagle climbed into the back seat and stabbed Jeno to death. Afterwards, Walking Eagle and Lambert put Jeno's body in a coulee near the road.
 
 
 7
 At approximately 1:30 a.m. on April 4, 1993, after the officers obtained a statement from Lambert, they interrogated Walking Eagle for about eighty minutes. The interview took place in the administrative section of the jail, rather than the confinement section. The officers did not handcuff Walking Eagle during the interrogation. They told Walking Eagle that they wanted to talk to him about a murder. Cruse testified that he read Walking Eagle his Miranda rights and obtained his signature on a waiver card before the interview began. ER 63-64. Wixson testified that the officers provided Walking Eagle with cigarettes and coffee during the interrogation. SER 41.
 
 
 8
 During the interrogation, Walking Eagle corroborated Lambert's story that he stabbed Jeno.[1] At the close of the interrogation, Wixson went over Walking Eagle's statement with him and obtained his signature.
 
 
 9
 On June 7, 1993, Walking Eagle moved to suppress the statement he made to the officers. On August 2, 1993, the government filed a motion in limine to exclude from the suppression hearing testimony from Walking Eagle's psychologist.[2] The district court granted the government's motion. At the close of the suppression hearing, the court concluded that Walking Eagle's statement was voluntary, and therefore admissible.
 
 
 10
 The trial commenced on February 7, 1994, and on February 10, 1994, the jury returned a verdict of guilty. On May 3, 1994, Walking Eagle was sentenced to life in prison.
 
 
 11
 On appeal, Walking Eagle argues that the district court erred in refusing to suppress the statement he made to the officers. He also asserts that the district court abused its discretion in granting the government's motion in limine to exclude expert psychological testimony from the suppression hearing. Finally, Walking Eagle contends that the district court erred in imposing a mandatory life sentence.
 
 II. ANALYSIS
 A. VOLUNTARINESS
 
 12
 The district court's conclusion that a defendant's statements were voluntary is reviewed de novo. United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir.1993). We review a district court's findings of fact underlying the voluntariness inquiry, including findings of fact as to a defendant's state of mind, for clear error. United States v. Miller, 984 F.2d 1028, 1030 (9th Cir.1993). The government bears the burden of proving that the defendant's statements were voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972); Commonwealth of Northern Mariana Islands v. Mendiola, 976 F.2d 475 (9th Cir.1992).
 
 
 13
 If a statement is not the product of a rational intellect and free will, then it is not voluntary within the meaning of the Due Process Clause of the Fifth Amendment. Blackburn v. Alabama, 361 U.S. 199, 208 (1960); United States v. Kelley, 953 F.2d 562, 564 (9th Cir.1992). In determining whether a statement is voluntary, the totality of circumstances must be considered. Crane v. Kentucky, 476 U.S. 683 (1986); Kelley, 953 F.2d at 564. The totality of circumstances includes "both the characteristics of the accused and the details of the interrogation." Kelley, 953 F.2d at 565 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Although a defendant's mental condition is a factor, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Colorado v. Connelly, 479 U.S. 157, 167 (1986); Kelley, 953 F.2d at 565.
 
 
 14
 In Kelley, we held that a statement given to the police while the defendant was suffering from heroin withdrawal was voluntary. Kelley, 953 F.2d at 565-66. In Kelley, the FBI handcuffed the defendant to a chair and questioned him for an hour and twenty minutes, thirty minutes of which he suffered noticeable withdrawal symptoms. Although he began to tremble and shake, Kelley remained responsive and told the FBI agents that he was able to proceed with the interview. We determined that, despite the withdrawal symptoms, Kelley's statement was a product of his rational intellect and free will. Id. at 565. We concluded in Kelley that the circumstances of the interrogation did not reach the requisite level of coercive activity necessary to support a finding that the defendant's statement was not voluntary. Id. at 565-66.
 
 
 15
 Walking Eagle contends that the statement he made to the officers was not voluntary because he was particularly vulnerable at the time he made the statement. He testified that he had the flu, a hangover, a lack of food and sleep, and an extremely dependent personality. But like the defendant in Kelley, there is nothing to indicate that these factors affected Walking Eagle's ability to think clearly and rationally. Thus, the district court did not clearly err when it found that Walking Eagle's statement was a product of his free will and rational intellect.
 
 
 16
 Furthermore, as in Kelley, the facts of the instant case do not indicate the requisite level of official coercion necessary to support a finding that Walking Eagle's statement was not voluntary. Not only did the officers not handcuff Walking Eagle, but they were also unaware that he was ill. In comparison, the officers in Kelley handcuffed the defendant and proceeded with the interrogation even though they knew he was suffering from withdrawal. Yet the police conduct in Kelley was still not enough to support a finding of official coercion. Additionally, the district court in the instant case found that the officers advised Walking Eagle of his rights, obtained a waiver of his rights, went over the statement he had made to them, and obtained his signature on the statement.
 
 
 17
 Therefore, because there was no official coercion in this case, we conclude that Walking Eagle's statement was voluntary within the meaning of the Due Process Clause.
 
 B. EXPERT PSYCHOLOGICAL TESTIMONY
 
 18
 We review the district court's decision to admit expert testimony for an abuse of discretion. United States v. Rahm, 993 F.2d 1405, 1409-10 (9th Cir.1993).
 
 
 19
 Walking Eagle argues that the district court erred in excluding from the suppression hearing testimony from his psychologist.[3] Walking Eagle maintains that this testimony was designed to show that because he is especially vulnerable to authority figures, the official conduct in this case was thus coercive.
 
 
 20
 In Connelly, the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Connelly, 479 U.S. at 167. The Court in Connelly concluded that because there was no official coercion of the suspect, the confession obtained from a schizophrenic defendant was voluntary. Id. at 164. The Court stated that although sweeping inquiries into the defendant's state of mind aid in determining the reliability of the statement, they do not help resolve the issue of voluntariness, unless there is first a finding of official coercion. Id.
 
 
 21
 In Derrick v. Peterson, 924 F.2d 813, 818 (9th Cir.1990), we held that a defendant's age and mental capacity are relevant to the voluntariness inquiry only if there is first a finding of official coercion. In Derrick, the defendant was a borderline mentally retarded juvenile with a mental age of nine years. Derrick argued that the police conduct was coercive because of his age and mental capacity. We rejected this argument as "precisely the type that Connelly intended to foreclose." Id. Because there was no police coercion, we concluded in Derrick that the defendant's personal characteristics were irrelevant, and the statement was voluntary. Id.
 
 
 22
 Like the defendant in Derrick, Walking Eagle argues that his particular characteristics make the official conduct in his case coercive. Walking Eagle's psychologist would have testified that he is more susceptible to influence from authority figures than the average individual, and thus the officers' conduct was coercive. This argument implies, as did the defendant's argument in Derrick, that absent the defendant's particular characteristics, the officers' conduct was not coercive. But this reverses the proper analysis. It is precisely because the officers' conduct was not coercive that testimony from Walking Eagle's psychologist is irrelevant. See also United States v. Chischilly, 30 F.3d 1144, 1151 (9th Cir.1994) (holding that in the absence of official coercion a defendant's state of mind is irrelevant to the due process inquiry into the voluntariness of the confession).
 
 
 23
 Federal Rule of Evidence 702 states that expert testimony is admissible if the specialized knowledge of the expert will assist the trier of fact in understanding or determining a fact in issue. Walking Eagle argues correctly that his psychologist had specialized knowledge of his personality disorder. However, the specialized knowledge would not have helped the judge decide the only fact in issue at the suppression hearing: whether the statement was voluntary.
 
 
 24
 Official coercion is a necessary first step in this determination. Connelly, 479 U.S. at 167. The district court did not find coercive activity; therefore, the voluntariness inquiry was complete without delving into Walking Eagle's personal characteristics. Since his characteristics were not relevant, the psychologist could not aid the trier of fact in deciding a fact in issue. Therefore, the district court properly excluded the testimony of the defense psychologist at the suppression hearing.
 
 
 25
 We hold that the district court did not abuse its discretion in granting the government's motion in limine to exclude testimony of Walking Eagle's psychologist at the suppression hearing.
 
 C. MANDATORY MINIMUM LIFE SENTENCE
 
 26
 We review the district court's interpretation of the Sentencing Guidelines de novo. United States v. Buenrostro-Torres, 24 F.3d 1173, 1174 (9th Cir.1994).
 
 
 27
 Walking Eagle argues that the conflict between the Sentencing Reform Act of 1984, 18 U.S.C. Sec. 3553(b),[4] and the statute under which he was sentenced, 18 U.S.C. Sec. 1111(b),[5] creates an ambiguity that is best solved by choosing the more lenient of the two statutes. Walking Eagle argues that section 3553(b), the Sentencing Reform Act, requires that a court consider mitigating factors not adequately attended to by the Sentencing Commission, whereas section 1111(b), the statute under which he was sentenced, requires a mandatory minimum life sentence.
 
 
 28
 In United States v. LaFleur, 971 F.2d 200, 209 (9th Cir.1991), we addressed this apparent conflict and held that Congress did not intend to modify the mandatory minimum life sentence required by section 1111(b). Walking Eagle's position is essentially the same as that of the dissent in LaFleur.
 
 
 29
 In LaFleur, we rejected the position that the conflict between the sentencing polices provided for a sentencing procedure that takes mitigating factors into consideration. Id. at 213. In LaFleur, we determined that Congress did not intend to modify the sentencing scheme of section 1111(b) when it enacted section 3551 et seq., sections 991-98, and the corresponding Sentencing Guideline section 2A1.1. Id. at 207-10. We concluded in LaFleur that although Congress eliminated the possibility of parole when it passed the Sentencing Reform Act, this elimination did not alter the mandatory minimum life sentence provided for in section 1111(b). Id. at 209.
 
 
 30
 Because Walking Eagle's sentencing argument is foreclosed by our holding in LaFleur, we conclude that the district court did not err in imposing a minimum life sentence without considering mitigating evidence.
 
 III. CONCLUSION
 
 31
 Walking Eagle's conviction and sentence are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 There were a few discrepancies between Walking Eagle's and Lambert's stories. Walking Eagle indicated that he, not Lambert, went to buy the beer and, upon his return, Lambert and Jeno were fighting. His version also differed from Lambert's regarding where they found the knife used to stab Jeno
 
 
 [2]
 The defense's psychological testimony was designed to show that Walking Eagle has a dependent personality, and thus is more vulnerable than the average person to pressure from authority figures. Blue Brief 8
 
 
 [3]
 When defense counsel moved to admit the psychologist's testimony, he maintained that he only wanted to introduce the psychologist's testimony at the suppression hearing, and not at trial. After the district court refused to admit the psychologist's testimony at the suppression hearing, defense counsel moved the court to reconsider admitting the psychologist's testimony at trial for the purpose of attacking the credibility of the confession. The district court denied the request
 Although Appellant's brief did not raise the issue of the admissibility of the psychologist's testimony at trial, the issue was raised at oral argument. Because Appellant's brief focused solely on the issue of the admissibility of the psychologist's testimony at the suppression hearing, we conclude that the issue was not preserved on appeal.
 
 
 [4]
 Section 3553(b) reads as follows:
 The court shall impose a sentence of the kind, ..., referred to in [the Sentencing Guidelines] unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described.
 18 U.S.C. Sec. 3553(b) (emphasis added).
 
 
 [5]
 Section 1111(b) provides
 Whoever is guilty for murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life ...
 18 U.S.C. Sec. 1111(b) (emphasis added).