78 F.3d 595
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff/Appellee/Cross-Appellant,
v.
Edgardo MURRIETTA-NUNEZ, Francisco Parra-Lacarra, Efrain
Moroyoqui-Lacarra, Defendants/Appellants/Cross-Appellees.
 Nos. 94-10489, 94-10509, 94-10510, 94-10550 to 94-10552.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 17, 1995.
Decided Feb. 14, 1996.
 
 Before: SCHROEDER and ALARCON, Circuit Judges, and WHALEY, District Judge*.
 MEMORANDUM**
 On June 21, 1994, Edgardo Murrietta-Nunez, Francisco Parra-Lacarra, and Efrain Moroyoqui-Lacarra ("Defendants") were convicted of (1) Conspiracy to Possess with Intent to Distribute Marijuana in violation of 21 U.S.C. § 846, (2) Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1), and (3) Using or Carrying a Firearm During and in Relation to a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c)(1) ("section 924(c)"). The convictions were obtained after a combined motion hearing and bench trial at which the District Court denied Defendants' Motions to Suppress and pronounced them guilty as charged. On appeal, Defendants challenge the District Court's denial of their Motion to Suppress.
 On September 27, 1994, the District Court sentenced Defendants, applying the recently-enacted "safety valve" provision which creates an exception to the mandatory minimum sentences for low-level involvement in certain drug trafficking offenses. See 18 U.S.C. § 3553(f) (West 1995) ("section 3553(f)"). It is the application of this provision to Defendants which was challenged in the Government's Cross-Appeal.
 * MOTION TO SUPPRESS
 A. Factual Background
 On November 26, 1993, Agent Earl Scott ("Scott") of the United States Border Patrol ("Border Patrol") received a call complaining of several Mexican trespassers. The call was placed by Fern Salcido, on behalf of her brother-in-law, Francisco Salcido, who speaks no English or Spanish. Scott radioed a fellow Border Patrol agent, Jeffrey Dawdy ("Dawdy"), to assist with the investigation.
 The agents arrived at Menager's Dam, Arizona, a village on the Tohono O'Odham Indian Reservation. There were two structures at the address provided to them: a house shared by Francisco Salcido and Moline ("House 1") which is small and made of adobe, and another building ("House 2"), owned by Ramon Salcido. House 2 was approximately twenty to thirty feet away from House 1 and was also made of adobe.
 Five or six adults and a number of children were present at the address, including Fern Salcido, Francisco Salcido, Ramon Salcido, and Mary Anne Moline ("Moline"). When Dawdy approached Moline and asked about the telephone complaint, Moline pointed to House 2, stating, "They're in my shed and I want them out."
 The agents then knocked on the door at House 2 and attempted unsuccessfully to open it, finding it locked from the inside. They identified themselves in English and Spanish as Border Patrol agents but received no response, although they could hear people moving inside. Martin Salcido[1] then approached and stated that he owned House 2 and wanted the Mexicans removed.
 Dawdy told Moline that, because the door appeared fragile, he could kick it down. Moline told him to "go ahead." At that point, Defendants opened the door and exited House 2. The agents asked for Defendants' immigration papers but were told they had none. The agents then performed a pat-down search on the three Defendants. A small bag containing bullet cartridges was found in the jacket worn by Efrain Moroyoqui-LaCarra ("Moroyoqui-LaCarra"). The agents found no other contraband on any of the others. They conducted another pat-down search, looking for a weapon to match the bullets, and were told that none of the three had a weapon.
 Dawdy then locked the three Defendants in his vehicle and returned to House 2. With the help of one of the Salcido children who carried a flashlight, Dawdy observed several unopened bundles on the floor which, based on his experience, he believed to be drugs. After removing one of the bundles from underneath a cot, Dawdy returned to House 2 and found, under the cot, a nickel-plated .38 Super Colt pistol. It was loaded with a full magazine inserted and a round in the chamber. The bullets found in Moroyoqui's coat pocket appeared to match those found in the gun.
 Defendants were advised of and waived their Miranda rights at the Border Patrol station. Upon questioning, each Defendant told the agents that he knew the gun was in House 2, that it belonged to the guide, Ramon Sainz ("Sainz"), and that Sainz had left it to protect the marijuana. Moroyoqui-LaCarra also stated that Sainz had left the bullets and the jacket in House 2 that Moroyoqui-LaCarra was wearing at the time of his arrest.
 In February 1994, Special Agent James Cherry ("Cherry") of the U.S. Customs Service interviewed Moline, Francisco Salcido, Ramon Salcido and others at Menager's Dam. Cherry learned that Ramon Salcido was the owner of the two buildings. Ramon Salcido told Cherry that he permitted his brother Francisco Salcido, Moline, and their children to stay in House 1. He also indicated that he occasionally stayed in House 2, and permitted the children of Moline and Francisco Salcido to stay there during hot weather.
 Cherry also learned that Alan Salcido, the brother of Francisco Salcido and Ramon Salcido, had arranged to have marijuana brought to the residence on prior occasions, and that Francisco Salcido had been paid for the use of Houses 1 and 2 on the prior occasions. Moline and Francisco Salcido speculated that Francisco Salcido would have been paid if the load that Defendants had carried had not been seized. Moline also told Cherry that Ramon Salcido was aware of a prior load of marijuana being stored in House 2.[2]
 B. Standing
 The District Court's finding that Defendants lacked standing to assert a Fourth Amendment claim is reviewed de novo, while the underlying facts are reviewed for clear error. United States v. Davis, 932 F.2d 752, 756 (9th Cir.1991).
 In order to have standing, Defendants must have had a legitimate expectation of privacy in the things seized and the place searched. United States v. Echegoyan, 799 F.2d 1271, 1277 (9th Cir.1986) (citation omitted). That is, Defendants must exhibit "an actual subjective expectation of privacy" and that expectation must be one "society is prepared to recognize as reasonable." Id., 799 F.2d at 1277 (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).
 Without explicitly stating its factual findings, the District Court concluded that the Defendants had no standing to assert a Fourth Amendment claim with regard to the search of House 2. Implicit in this conclusion, and suggested by the record, is the factual finding that Defendants occupied House 2 without permission to do so. At the hearing, Defendants argued that their permission to stay in House 2 should be inferred from the following facts: on prior occasions, Alan Salcido arranged to have marijuana delivered to House 1, Francisco Salcido was paid for the use of House 2, and Ramon was aware that a prior load of marijuana was stored there.
 It was not clear error for the District Court to reject this inference and to find that Defendants were trespassers. Davis, 932 F.2d at 756. As such, the District Court's finding that Defendants lacked standing to assert a Fourth Amendment challenge to the search of House 2 is affirmed.
 C. The Search
 Review of the legality of a warrantless search is conducted de novo, while the underlying findings of fact are reviewed only for clear error. United States v. Hoyos, 892 F.2d 1387, 1396 (9th Cir.1989), cert. denied, 489 U.S. 825 (1990). The Ninth Circuit has not decided whether the determination that an individual had authority to consent to a search is reviewed under a either under a de novo or clear error standard. United States v. Kelley, 953 F.2d 562, 566 (9th Cir.1992).
 In denying the motion to suppress, the District Court found that the search of House 2 was by consent of either the owner or possessor of the building.
 1. Actual and Apparent Authority
 The Government bears the burden of proving effective consent. United States v. Impink, 728 F.2d 1228, 1232 (9th Cir.1984). A consensual search is reasonable when the consent-giver has "common authority" over the area searched. United States v. Matlock, 415 U.S. 164 (1974). "Common authority" rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspection and others have assumed the risk that the third parties might consent to the search. Id. at 171 n. 7; United States v. Yarbrough, 852 F.2d 1522, 1534 (9th Cir.), cert. denied, 488 U.S. 866 (1988).
 A warrantless search is also justified when the authorities have reasonable grounds to believe the person giving consent has the apparent authority to do so. United States v. Sledge, 650 F.2d 1075, 1077-78 (9th Cir.1981). In making this determination, the court should consider (1) whether the third party has an equal right of access to the premises, (2) whether the suspect is present at the time the third party consent is obtained, and (3) if so, whether the suspect actively opposes the search. United States v. Warner, 843 F.2d 401, 403 (9th Cir.1988) (citation omitted).
 While the factual findings on consent are not explicitly set forth by the District Court, Moline's actual authority to consent is supported by the evidence that the owner was present when Moline and Martin Salcido consented to the search and the evidence that their children slept in the building during hot weather. Further, the record supports Moline's apparent authority to consent at the time of the search. She lived next to House 2 and claimed it as hers. Others present at the scene, including the owner, did not contradict her statements to the agents.
 D. Search Incident to a Valid Arrest
 The District Court also upheld the search as incident to a valid arrest. A search incident to a valid arrest consists of a "protective sweep" conducted when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 327 (1990).
 In the instant case, articulable facts and the inferences drawn therefrom supported the entries into the structure in search of other individuals and weapons. First, the officers had been called to remove "several" individuals from the premises. Second, upon conducting a pat-down search, the agents found bullets but no gun. Taken together, it was reasonable for the agents to believe that someone might have remained in House 2 with a gun and to search that area incident to the arrest of the three defendants.
 The fact that the Defendants were arrested outside of House 2 and placed in the van while the search of the building occurred does not render the protective sweep invalid.
 If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another.
 Hoyos, 892 F.2d at 1397 (protective sweep justified even though the defendant was arrested outside of his house).
 Nor did the District Court commit clear error in concluding that Dawdy's search did not exceed the scope of a protective sweep. United States v. Huffhines, 967 F.2d 314, 319 (9th Cir.1992). Once Dawdy entered House 2, the bundles were immediately visible. He testified that his experience led him to believe that the bundles contained drugs and, once he moved them, he was able to actually smell the marijuana they contained. Once the bundles were removed, the gun could also be plainly seen. Given this testimony, the District Court's conclusion is not clear error and thus, is affirmed.
 E. Confessions
 Finally, Defendants' argument that their confessions should be suppressed as fruits of the poisonous tree fails. Brown v. Illinois, 422 U.S. 590, 603-4 (1975). This argument fails both because it was not argued before the District Court and because the result has already been determined by the ruling on the search issues.
 II
 MOTION TO REMAND
 All Defendants were convicted of using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). At that time, Ninth Circuit case law interpreted section 924(c)(1) quite broadly to include situations in which,
 ... if its physical proximity to the defendant at any time during the commission of the crime, or during arrest, supports the inference that it emboldened him to commit the underlying offense or to resist arrest.
 United States v. Torres-Medina, 935 F.3d 1047, 1050 (9th Cir.1991) (handgun located next to drug paraphernalia hidden underneath a house was "available" to a paraplegic defendant because, inter alia, the defendant owned the gun and it emboldened him to commit the underlying drug crime).
 Since oral argument in November, Defendants have moved this Court to vacate the convictions under section 924(c) in light of the Supreme Court's recent decision in Bailey v. United States, 1995 WL 712269 (U.S. Dec. 6, 1995) (unanimous opinion ). The Government agrees that the conviction must be vacated.
 
 
 1
 Defendants' Motion to Remand is granted because it is apparent that Defendants' convictions under section 924(c)(1) are not supported by sufficient evidence after Bailey. See United States v. Spears, 631 F.2d 114, 117 (9th Cir.1980) (citations omitted). The essential elements of a conviction under section 924(c) are (1) knowing use or carrying of a firearm (2) during and in relation to a drug trafficking crime. United States v. Martinez, 967 F.2d 1343, 1346 (9th cir. 1992).
 
 
 2
 Taking the facts in the light most favorable to the Government, a loaded pistol was found in House 2 behind the cot under which the marijuana was stored. Defendants knew the firearm was there, that it belonged to their guide, Sainz, and understood that it would be used to protect the marijuana. In the jacket worn by Defendant Moroyoqui-LaCarra bullet cartridges were found which matched the firearm.
 
 
 3
 Under Bailey, this activity does not constitute the "use" or "carrying" of a firearm necessary to support a conviction under section 924(c)(1). Bailey rejected the argument that "simple possession with a floating intent to use" rises to the level of "use" or "carrying." Id. at * 5. The Court stated that,
 
 
 4
 liability attaches only to cases of actual use, not intended use, as when an offender places a firearm with the intent to use it later if necessary.
 
 
 5
 Id. at * 7. The Court rejected the reading of section 924(c)(1) under which,
 
 
 6
 a gun placed in a closet is "used," because its mere presence emboldens or protects its owner.... Under this reading, mere possession of a firearm by a drug offender, at or near the site of a drug crime or its proceeds or paraphernalia, is a "use by the offender, because its availability for in intimidation, attack, or defense would always, presumably, embolden or comfort the offender. But the inert presence of a firearm, without more, is not enough to trigger § (c)(1). Perhaps the nonactive nature of this asserted "use" is clearer if a synonym is used: storage. A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession.
 
 
 7
 Id. at * 8.
 
 
 8
 The Court made it clear that placement for later, active use does not constitute "use."
 
 
 9
 An alternative rationale for why "placement at the ready" is a "use"--that such placement is made with the intent to put the firearm to a future active use--also fails.... congress knew how to draft a statute to reach a firearm that was "intended to be used." In 924(c)(1), it chose not to include that term, but instead established the five-year mandatory minimum only for those defendants who actual "use" the firearm.
 
 
 10
 Id. at * 8.
 
 
 11
 Thus, Defendants' actions--storing the gun for possible, later use--do not constitute "use" or "carrying" under Bailey. We vacate Defendants' convictions under section 924(c)(1).
 
 III
 GOVERNMENT'S CROSS-APPEAL
 
 12
 On cross-appeal, the Government argues that the District Court improperly applied the "safety valve" provision of the Sentencing Guidelines. As recognized by the Government, the vacating of Defendants' convictions under section 924(c) renders moot its cross-appeal. Because Defendants' sentences for Counts 1 and 2 were based, in part, on the convictions under section 924(c), the sentences are vacated and remanded for resentencing.
 
 
 13
 AFFIRMED IN PART. CONVICTIONS AND SENTENCES UNDER 18 U.S.C. § 924(c)(1) VACATED. SENTENCES UNDER 21 U.S.C. §§ 841 AND 846 VACATED AND REMANDED FOR RESENTENCING.
 
 
 
 *
 Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Dawdy identified the individual as Francisco Salcido in his ensuing report, but he later concluded that this was actually Martin Salcido
 
 
 [2]
 Appellants' argument to establish standing is based on the Cherry interviews. The credibility, reliability, and foundation of the information received in Cherry's interviews, as compared to the evidence obtained at the time of the search, is evident from the record and is reflected in the trial judge's findings