**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Pamela Mejia Armenta IGLESIAS,
Defendant–Appellant.**

No. 88–3052.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1989.

Decided Aug. 15, 1989.

Stephen M. Jacobson, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Frank Noonan, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before TANG, BOOCHEVER and KOZINSKI, Circuit Judges.

TANG, Circuit Judge:

On January 28, 1988, pursuant to Fed.R. Crim.P. 11(a)(2), Pamela Iglesias entered a conditional guilty plea to a charge of possession with intent to distribute heroin, reserving her right to appeal the district court's denial of her motions to suppress and to compel discovery. We first determine whether the district court erred in refusing to suppress Iglesias' incriminating cash that was seized when police searched her sister's residence. Secondly, we decide whether the district court erred in ruling that Fed.R.Crim.P. 16(a)(1)(D) does not compel production by the government of certain internal documents. We affirm.

## I. Factual and Procedural Background

On August 12, 1987, a grand jury handed down a seven-count indictment against Iglesias and Collins. Count VII charged Iglesias and Collins with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) to which Iglesias entered her conditional guilty plea. Judge Frye imposed a sentence of 12 years imprisonment followed by a Special Parole Term of 6 years. Iglesias is currently in federal custody serving this sentence.

### A. Suppression Issue

The facts relevant to the suppression issue follow. On July 31, 1987, at about 2:00 p.m., Portland Police Sgt. Edward May and IRS criminal investigator Deborah Delt went to the residence of Iglesias' sister, Shannon Anderson. After knocking on the door, Sgt. May told Anderson that he was investigating the drug activities of Iglesias. Iglesias claims she had a key to Anderson's residence and permission to store her property there. When Anderson indicated a reluctance to talk about her sister, Sgt. May said that an alternative would be to have Anderson subpoenaed by the grand jury. According to Iglesias, Sgt. May also told Anderson that he would return with dogs and a search warrant if he didn't get the information he wanted. According to the government, Sgt. May considered Anderson to be an "innocent bystander" and did not threaten her in any way.

Anderson then revealed the existence of a paper sack in the basement belonging to Iglesias and gave Sgt. May permission to retrieve it. At that point, Anderson's husband came home and concurred in this permission. Delt and Anderson accompanied Sgt. May to the basement. Later inspection revealed that the sack contained cash including bills with prerecorded serial numbers from controlled drug transactions.

On October 30, 1987, with respect to the cash seized from Anderson's residence, Iglesias filed a motion to suppress. The government filed a response on November 10, 1987.

Hearings were held on December 9, 1987 and January 12, 1988. An expert witness, Anne Filmore, testified that "a combination of factors, including Sgt. May's large size, overbearing manner, and body language were geared to frighten and intimidate Ms. Anderson," and concluded that "[t]he cumulative effect of the interrogation was to terrify Ms. Anderson." In denying the motion, Judge Burns did not rule on whether Iglesias had standing to assert a Fourth Amendment claim but concluded that the search was not unlawful.

### B. Discovery Issue

The facts relevant to Iglesias's request for discovery under Fed.R.Crim.P. 16(a)(1)(D) are as follows. A dark black sticky substance was purchased by an undercover Portland police officer from alleged co-conspirator Dee Collins. The substance was sent to the Drug Enforcement Administration ("DEA") Regional Laboratory in San Francisco for analysis. The Forensic Chemist, Gary J. Sorgen, tested the substance and wrote a report dated August 6, 1987, indicating that the substance was 54.9% pure heroin.

On September 25, 1987, Iglesias submitted a discovery request to the government asking in part for

[a]ll documents associated with any scientific analysis of any controlled substance seized or otherwise obtained in the course of any investigation leading to or otherwise associated with the prosecution of this case. This request includes but is not limited to those records memorializing the storage and transportation of any such substance from the time of seizure or acquisition and thereafter up to and including the trial in this matter.

ER 23. The government provided Iglesias with the DEA lab report and agreed to set up a conference between defense counsel and the DEA chemist. The government, however, refused to turn over the "log notes," protocols, and other internal documents of the chemists who worked on the analysis.

After the government refused to turn over the chemist's "log notes" and other such material, Iglesias filed a motion to compel the production of these documents. At the conclusion of the suppression hear-

ing, the district court heard argument on the motion to compel. Judge Burns denied the motion and suggested that Iglesias accept the government's offer to speak with the DEA chemist.

## II. Suppression of Seized Cash

### A. Standards of Review

■ We review the question of whether a defendant has standing to assert a Fourth Amendment claim de novo, *United States v. Echegoyen,* 799 F.2d 1271, 1277 (9th Cir.1986), although we review the underlying facts for clear error. *United States v. Feldman,* 788 F.2d 544, 550 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). We review for clear error a district court's ruling that a consent to search was voluntary. *United States v. Licata,* 761 F.2d 537, 544 (9th Cir.1985).

### B. Standing

■ In general, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises ... has not had any of his Fourth Amendment rights infringed." *United States v. Kinsey,* 843 F.2d 383, 389 (9th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 99, 102 L.Ed.2d 75 (1988). In order to have standing to assert a Fourth Amendment claim, a defendant must have had an actual, subjective expectation of privacy. This expectation must be one that society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

The question of whether Iglesias has standing is a close one.[1] But because we hold that the search was not unlawful, we assume, without deciding, that Iglesias has standing to raise a Fourth Amendment claim.

### C. Voluntariness of Consent

■ Iglesias raises two interrelated issues in support of her claim that Anderson did not really consent to the search and seizure of the cash. First, Iglesias argues that because of Sgt. May's "threat" to have the grand jury issue a subpoena, Anderson's statements to Sgt. May were involuntary, and that the seized cash should thus be suppressed as fruit of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Iglesias, relying on *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), points out that Sgt. May does not have the power to issue grand jury subpoenas. In *Bumper,* police officers obtained "consent" to search by falsely telling the occupant that they had a search warrant. The Court ruled that the "consent" was involuntary and therefore not valid. *Bumper,* 391 U.S. at 550, 88 S.Ct. at 1792.

The situation in the instant case does not rise to the level of the deception and coercion found in *Bumper.* Although Sgt. May himself does not have personal authority to issue grand jury subpoenas, it was not impermissible for him to inform Anderson that a search warrant and a grand jury subpoena were viable options. On this ground, the decision of the district court upholding the lawfulness of the search was not clearly erroneous.

■ Second, Iglesias argues that considering the totality of circumstances, Anderson's consent was involuntary. Indeed, to be effective, consent to search must be given voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To support her claim that the consent was not given voluntarily, Iglesias alleges: (a) that Sgt. May

---

1. In support of having standing, Iglesias points to the facts (a) that the cash was seized from the residence of a close relative of Iglesias, her sister; (b) that the cash was in a "closed container" owned by Iglesias; (c) that Iglesias had "complete access" to the items stored in Anderson's basement; and (d) that Iglesias had a "strong legitimate" expectation of privacy. On the other hand, to support its position that Iglesias lacked standing, the government relies on the facts (a) that the search took place at the residence of a third party; (b) that Iglesias had given the seized cash to Anderson with instructions to distribute portions of that money to third-parties; (c) that Anderson and her husband used some of the money for their personal expenses; and (d) that the circumstances of this case do not demonstrate the sort of reasonable and subjective expectation of privacy which society is prepared to accept as legitimate.

made threats and assertions of authority that had no lawful basis (i.e., issuance of a grand jury subpoena, as discussed above); (b) that Anderson was vulnerable in her home and was confronted with separation from her small child, who was present during the interrogation; (c) that a substantial amount of time was required to overbear Mr. Anderson's will; (d) that May and Delt utilized sophisticated psychological manipulation including a classic "Mutt and Jeff" approach; and (e) that Anderson indicated a desire to invoke her Fifth Amendment right against self-incrimination. None of these factors mentioned by Iglesias, either individually or in their totality, are sufficient to render Anderson's consent involuntary. *See United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988). The decision of the district court in refusing to suppress the evidence was not clearly erroneous.

### III. Discovery of Internal Government Documents

**A. Standards of Review**

■ A district court's discovery rulings under Fed.R.Crim.P. 16 will not be disturbed absent an abuse of discretion, *United ed States v. Balk*, 706 F.2d 1056, 1060 (9th Cir.1983), although we review de novo a district court's legal construction of Rule 16. *United States v. Givens*, 767 F.2d 574, 583 (9th Cir.) (relating to Fed.R.Crim.P. 16(a)(1)(C)), *cert. denied*, 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985).

**B. Rule 16(a)(1)(D)**

■ The text of Fed.R.Crim.P. 16(a)(1)(D), in relevant part, is as follows:
Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of ... scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known ... and which is material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

If the material requested by Iglesias falls within the domain of Fed.R.Crim.P. 16(a)(1)(D), disclosure by the government is mandatory. Notes of Advisory Committee on 1974 Amendment to Fed.R.Crim.P. 16. The government does not claim that the requested material is irrelevant, nor does the government claim that it does not have the material in its possession. Rather, the crux of the government's argument is simply that the requested material does not fall within the scope of the rule. The government's position is that it satisfied its Rule 16(a)(1)(D) obligations by turning over the lab reports. We agree.

Looking again at the operative wording of Rule 16(a)(1)(D): the defendant is entitled to "any *results* or *reports* ... of scientific experiments" (emphasis added). If the requested documents are either "results" or "reports," then Iglesias is entitled to the discovery. It is perhaps not immediately obvious whether the internal log notes are in fact "results" or "reports."

The definition of the term "report" is "[a]n official or formal statement of facts or proceedings." *Black's Law Dictionary* 1464 (4th ed. 1968).[2] The definition of "result" is "the conclusion or end to which any course or condition of thing leads." *Id.* at 1478. Certainly, the lab report that Iglesias did receive indicating 54.9% pure heroin is clearly a "report" or a "result" and thus does fall within the meaning of Rule 16(a)(1)(D).

But the requested log notes do not have the requisite formality or finality to be considered as either a "report" or a "result." Although it is possible that the requested log notes would allow Iglesias to provide a more effective defense, the government is under no legal duty under Rule 16(a)(1)(D) to turn over such informal internal documents.

Rule 16 was drafted "to expand the scope of pretrial discovery" while at the same time "to guard against possible abuses." Notes of Advisory Committee on 1966 Amendment to Fed.R.Crim.P. 16. While

---

**2.** Similarly, the everyday definition of "report" is "[a]n account ... that is prepared, presented, or delivered, usually in formal or organized form." *American Heritage Dictionary* 1103 (6th ed. 1976).

we certainly respect defendants' rights to inspect and copy the actual results or reports of scientific tests, we are not willing to force the government to disclose every single piece of paper that is generated internally in conjunction with such tests.

The 1974 Advisory Committee Notes to Rule 16(a)(1)(D) makes it clear that mandatory disclosure of reports of scientific tests is justified because:

> (1) it is difficult to test expert testimony at trial without advance notice and preparation;
>
> (2) it is not likely that such evidence will be distorted or misused if disclosed prior to trial; and
>
> (3) to the extent that a test may be favorable to the defense, its disclosure is mandated under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

These justifications are not applicable to internal documents like the log notes requested by Iglesias. First, the actual reports received by Iglesias are sufficient to enable her to adequately cross-examine the government chemist.[3] Second, unlike the final reports, the preliminary log notes are much more likely to be distorted and misused. Third, there are no allegations that the log notes must be disclosed under the mandate of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

If we were to reverse the district court and compel the government to turn over the internal documents to Iglesias, this would violate both the plain meaning and the spirit of Rule 16(a)(1)(D), and also would place unreasonable burdens on the government in future cases.

### IV.

The judgment of the district court is AFFIRMED.

BOOCHEVER, Circuit Judge, dissenting in part:

Because I believe that the documents generated in connection with the chemical testing are discoverable under Fed.R. Crim.P. 16, I respectfully dissent.

### I. *The Discovery Ruling*

Rule 16(a)(1)(D) specifies that "[u]pon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports ... of scientific tests or experiments ... which are within the possession, custody or control of the government ... and which are material to the preparation of the defense...." The construction of the rule is a question of law which we review de novo. *See United States v. Horowitz,* 756 F.2d 1400, 1403 (9th Cir.), *cert. denied,* 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985).

The government refused a request that encompasses the chemist's log notes. All that has been furnished is a report containing the weight of the substance tested and the conclusory statement that the material contained heroin with a strength of 54.9%.

For its restrictive construction of the terms "any results or reports" the majority relies on certain dictionary definitions of a report as "an official or formal statement of facts or proceedings," and "result" as "the conclusion or end to which any course or condition of thing leads." Just as the devil may quote scriptures, however, a dissent can also cite from dictionaries. Thus *Webster's New International Dictionary* (2d ed. 1950), defines "report" as "an account or relation, esp. of some matter specially investigated". *Id.* at 2113. The log notes are accounts of the chemical investigation. The *Random House College Dictionary* (rev. ed. 1980), defines "report" as "an account or statement describing in detail an event, situation, or the like." *Id.* at 1119. Again, the log notes constitute an account describing in detail the chemical testing. The one line summary submitted, however, describes only the chemist's conclusion and certainly is not a detailed description of the testing.

When we look to dictionary definitions of "results" we likewise find considerable

---

**3.** Defendants can also challenge the accuracy of government reports with their own defense experts.

flexibility. Thus *Webster's New International Dictionary* (2d ed. 1950), includes in its definition "[s]omething obtained, achieved, brought about, etc., by calculation, investigation or the like...." *Id.* at 2126. The log notes were obtained and brought about by the chemical investigation of the substance. "Result" is defined in the *Random House College Dictionary* (rev. ed. 1980), as "outcome; consequence." *Id.* at 1126. Again the log notes are an outcome and consequence of the testing.

Dictionary definitions, therefore, are not determinative and we must endeavor to ascertain the sense in which the terms were used when the amendments to Rule 16 were enacted.

Originally, Rule 16 discovery grants were discretionary and limited to possessions seized or otherwise obtained from the defendant. Court decisions on narcotics testing held that while defendants were entitled to have their own experts test and independently verify the composition of the drugs at issue, they were not entitled to inspect the government's records. *See, e.g., United States v. Tirado,* 25 F.R.D. 270, 271 (S.D.N.Y.1958); *United States v. Bentvena,* 193 F.Supp. 485, 498 (S.D.N.Y. 1960). The rationale was that the drugs obtained by the government had once belonged to the defendant, whereas governmental paperwork was exclusively government property. *Tirado,* 25 F.R.D. at 271; *United States v. Fuentes,* 25 F.R.D. 278, 279 (S.D.N.Y.1958); *United States v. Lopez,* 26 F.R.D. 174, 175 (S.D.N.Y.1960).

In 1966, Rule 16 was amended, inter alia, to authorize discovery of the "results or reports ... of scientific tests or experiments made in connection with a particular case." The language, however, remained permissive. Despite the drafters' intent to liberalize discovery, the courts continued to deny detailed information about the government's drug testing procedures.

*See, e.g., United States v. Smaldone,* 484 F.2d 311, 320–21 (10th Cir.1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974); *Wolford v. United States,* 401 F.2d 331, 333 (10th Cir.1968).

The 1975 amendment to Rule 16 replaced the permissive language with mandatory language. The Advisory Committee on Criminal Rules commented that "[t]he rule is intended to prescribe the minimum amount of discovery to which the parties are entitled." Fed.R.Crim.P. 16 advisory committee's note, 1974 amendment.

The American Bar Association's recommendations on pretrial discovery were cited frequently in the committee's notes and were clearly given much weight. The ABA supports discovery of the type requested by Iglesias: "Where counsel is able, prior to trial, to become familiar with relevant tests, to determine that the tests performed were appropriate, and to become familiar with test procedures, midtrial continuances and laborious cross-examinations of the experts may be avoided." ABA, Standards for Criminal Justice, Commentary to Standard 11–2.1(a)(iv), (1986 Supp. vol. 2).

The advisory committee notes indicate that the term "any results or reports" is to be given a liberal, not a restricted construction.[1] The purpose is to enable counsel, prior to trial, to become familiar with the relevant tests, to determine that the testing was appropriate and to become familiar with the test procedures. A report such as that submitted by the government in this case, which is limited to a statement that the material tested contained heroin, tells nothing but the ultimate result of the relevant tests. It does not enable counsel to determine whether the testing was appropriate or to become familiar with the test procedures. Only if counsel is entitled to inspect and copy the log notes and any

---

1. Similarly the Notes of the Committee on the Judiciary, House Report No. 94–247, U.S.Code Cong. & Admin.News 1975, p. 674 state: "The Committee believes that it is desirable to promote greater pretrial discovery. As stated in the advisory committee note,

    broader discovery by both the defense and the prosecution will contribute to the fair and

efficient administration of criminal justice by aiding in informed plea negotiations, by minimizing the undesirable effect of surprise at trial, and by otherwise contributing to an accurate determination of the issue of guilt or innocence...."

other documents generated in connection with the testing will the attorney be able to determine whether the testing was appropriate.

The majority states that "unlike the final reports, the preliminary log notes are much more likely to be distorted and misused." The final report in this case is of no use in determining whether the testing was appropriate. Only by means of the notes may counsel ascertain anything about the method and accuracy of the testing. Counsel is entitled to explore any inconsistencies or ambiguities contained in the notes.

There is a striking absence of federal case law construing the term "any results or reports." There is no Ninth Circuit opinion on point. One Fifth Circuit decision ruled on the question without explaining its rationale. If this type of dispute is so unusual, the materials requested by Iglesias must routinely be granted and hence the issue has rarely come before the courts. In fact it is difficult to understand the government's reluctance to furnish the information sought in this case.

One case supports the majority. In *United States v. Berry*, 636 F.2d 1075 (5th Cir.1981) the Fifth Circuit denied discovery of a chemist's personal work notes and procedural manual in a case involving charges of possession with intent to distribute cocaine. The court, however, gave no analysis of Rule 16 or reasons for its conclusion.

Although none is directly on point, there are a United States Court of Appeals case and some state cases interpreting "results or reports." In *Holloway v. United States*, 343 F.2d 265 (D.C.Cir.1964) the court held that the district court erred in determining a criminal defendant's competence to stand trial on the basis of a letter merely stating that the accused was competent. Although D.C.Code § 24–301 allowed the trial court to determine competence on the basis of a "report" or "certificate," the court held the letter in this case did not qualify as a report because it did not inform the court of the information and reasons upon which it rested. *Id.* at 268.

In *State v. Burgess*, 482 So.2d 651 (La. Ct.App.1986), the court held that a Louisi-

ana discovery statute similar in part to Rule 16 required more than the conclusory report of two experts. The trial court had held that "results mean the ultimate result, not all of the combined tests that might go into coming to an ultimate result or report." The Court of Appeals reversed, holding that a purpose of the discovery statute was to afford the defendant a chance to prepare adequately for trial.

> We are of the opinion that disclosure of the various examination and/or test results used by an expert to formulate his conclusionary opinion is necessary for defendant's adequate preparation for trial, particularly the cross-examination of that expert. Fundamental fairness and due process require that the defense be given the opportunity, prior to trial, to examine the basis from which an expert reaches his conclusion.

482 So.2d 651 at 653.

In *Wynn v. State*, 423 So.2d 294 (Ala. Crim.App.1982), the court held that the term "results" as used in a stipulation for admission of results of a polygraph examination covered not only the examiner's final conclusion but background information necessary for evaluation of his opinion. *Id.* at 300.

As indicated previously, there is admittedly scant authority construing Rule 16's use of the phrase "any results or reports." It is clear, however, that each amendment of the rule was for the purpose of expanding discovery rights. The goal of the amended rule is to enable counsel, prior to trial, to become familiar with the relevant tests and test procedures and to determine whether the tests performed were appropriate. *See* ABA, Standards for Criminal Justice, Commentary to Standard 11–2.-1(a)(iv)(1986 Supp. vol. 2). The conclusory statement furnished in this case furthers none of these goals.

Iglesias requested:

> [a]ll documents associated with any aspect of any scientific analysis of any controlled substance seized or otherwise obtained in the course of any investigation leading to or otherwise associated with the prosecution of this case. This request includes but is not limited to

those records memorializing the storage and transportation of any such substance from the time of seizure or acquisition and thereafter up to and including the trial in this matter.

I would hold that Iglesias was entitled to inspect and copy "all documents of whatever sort generated in connection with" the tests, including the notes of the examiner. They are "results" of the testing. The manuals or guidelines used in the testing, and the instructions provided by the manufacturers of the test equipment, are not, strictly speaking, results or reports of the tests. The rule, however, is intended to provide the minimum amount of discovery to which the parties are entitled. *See* Fed. R.Crim.P. 16 advisory committee's note, 1974 amendment.

Although Iglesias appears to have waived the argument, the manuals, guidelines, and instructions may be discoverable under 16(a)(1)(C). *See United States v. Bel–Mar Laboratories, Inc.,* 284 F.Supp. 875, 887 (E.D.N.Y.1968). That subparagraph of the rule provides that the government shall, upon request, permit the defendant "to inspect and copy or photograph books, papers, [or] documents ... which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense...." The rule is mandatory. Requiring production of testing manuals and instructions appears to further the purpose of the rule and to come within its scope. The government has not questioned the materiality of the items requested. Unless the government shows that the materials are not within its possession, custody, or control, or shows that they are internal government documents falling within the exception set forth in Rule 16(a)(2), it would be error for the district court to deny that portion of the request. Even if Iglesias waived an argument based on Rule 16(a)(1)(C), however, at least some of the requested materials were discoverable under 16(a)(1)(D). Accordingly, I would reverse the discovery ruling.

## II. *The Consent to Search*

I can concur in the affirmance of the district court's finding that Ms. Anderson's consent to search was voluntary. I am concerned, however, that officer May allegedly advised that he would "have a grand jury subpoena issued" and would conduct a search with dogs. Truthfully, he could state that he would *seek* the issuance of the subpoena and a search warrant. While the difference may be a nicety, officers should not overstate their authority in order to induce a consent to search. Nevertheless, under the circumstances of this case I cannot find that the district court's finding of voluntariness was clearly erroneous.