United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 3, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-10615

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

WALTER BRYAN ASHLOCK

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
No. 3:02-CR-243-ALL-G

Before KING, Chief Judge, and BARKSDALE and PICKERING, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Walter Bryan Ashlock appeals from the district court's judgment of conviction and sentence. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 20, 2001, Ashlock was stopped for a traffic violation and was unable to present a driver's license. A computer check revealed that he had provided a false identity to the police officer, and the officer conducted a pat-down search

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of Ashlock, revealing a knife, drug paraphernalia, and fourteen grams of a powdery substance later identified as methamphetamine. Ashlock was arrested. An inventory search of the car uncovered more drug paraphernalia and at least two driver's licenses that were not issued under Ashlock's name.

After Ashlock expressed interest in helping the police arrest methamphetamine manufacturers, the officers contacted a member of the Northeast Area Drug Interdiction Task Force (NADITF). Ashlock signed a confidential informant agreement with the task force official, listing his address as 406 Carl C. Senter Street, and he was released pending laboratory testing of the powdery substance. Ashlock only remained in contact with the task force (as required by the informant agreement) for three days, and he never fulfilled his promise to assist task force officers in arresting local methamphetamine manufacturers. He was therefore considered terminated from the confidential informant program in January 2002. When the police laboratory subsequently reported that the powder Ashlock had been carrying contained methamphetamine, a warrant was issued for his arrest.

On January 10, 2002, Ashlock was stopped for a second traffic violation and a computer check revealed the outstanding arrest warrant. During the arrest, police officers discovered syringes and digital scales on his person as well as fifty-four grams of methamphetamine in plastic baggies, additional syringes, and various other items in the car he was driving.

2

From January until mid-April 2002, the police conducted periodic surveillance of the 406 Carl C. Senter address without observing Ashlock. On April 12, 2002, however, a repairman informed the police that Ashlock had threatened him while he was working at the Senter Street residence. The police secured a search warrant for Ashlock and discovered him in the back yard, carrying twenty-four grams of methamphetamine. A subsequent search of the house, pursuant to a second warrant, uncovered multiple items associated with manufacturing methamphetamine. The police then sought assistance from Drug Enforcement Administration agents, who questioned Ashlock at the police station. Ashlock informed the agents that he was planning to manufacture methamphetamine later that night and was willing to cooperate with the DEA in bringing in his manufacturing associates. The agents declined his offer of cooperation.

On August 2, 2002, the police arrested a woman, Debra Jean Cronin, who informed the police that Ashlock was currently residing at 1112 Desdemona Street in Dallas and that she had purchased small quantities of methamphetamine from Ashlock on two or three occasions. In addition, she admitted selling Ashlock thousands of stolen pseudoephedrine cold pills, presumably for use in manufacturing methamphetamine, at least two or three times. Armed with this information, the police obtained a search warrant for the Desdemona residence. Upon their arrival at the house, an unidentified man drove away in a black pickup truck,

which the police were unable to pursue after it ran through a stop light.

Later that night, Ashlock was arrested at a local hotel. He claimed that his name was Jerry Stone. He had two syringes, 0.8 grams of methamphetamine, and the keys to the previously identified black pickup truck in his possession. The police found the truck parked in the hotel garage. When officers searched Ashlock's Desdemona residence the next day, they discovered two firearms: a shotgun by the back door and a pistol under the mattress of the bed. The search also uncovered 111.9 grams of liquid methamphetamine, 0.87 grams of a powdery mixture containing methamphetamine, and other items associated with manufacturing and distributing methamphetamine. In addition, the officers found equipment for producing false identifications and a driver's license bearing Ashlock's picture under the name "Jerry Dale Stone."

After a jury trial, Ashlock was convicted of (1) conspiring to manufacture with the intent to distribute in excess of 500 grams of methamphetamine between September 2001 and August 3, 2002, see 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846; (2) possessing pseudoephedrine with the intent to manufacture and distribute methamphetamine on April 12, 2002, see id. § 841(c)(1); (3) possessing firearms as a convicted felon on August 3, 2002, see 18 U.S.C. §§ 922(g)(1), 924(a)(2); (4) possessing more than fifty grams of a mixture containing methamphetamine with the intent to

4

distribute it on August 3, 2002, see 21 U.S.C. § 841(a)(1), (b)(1)(B); and (5) possessing more than fifty grams of a mixture containing methamphetamine with the intent to distribute it on January 10, 2002, see id. On appeal, Ashlock raises numerous challenges to the district court's evidentiary rulings, denial of his motion for judgments of acquittal, jury instructions, and application of the sentencing guidelines. We address each issue in turn.

## II. DISCUSSION

### A. *Evidentiary Rulings*

Ashlock first contends that the district court erred in admitting testimony from the government's three forensic experts regarding the chemical identity of the numerous substances seized from his person and residences. He claims that the testimony should have been excluded because the government's discovery disclosures were untimely and failed to comply with FED. R. CRIM. P. 16(a). Before trial, Ashlock moved either to strike the experts' testimony or for a 90-day continuance because, while the district court's pre-trial scheduling order instructed the government to fulfill its Rule 16(a) discovery obligations by October 4, Ashlock did not receive the government's first expert witness disclosures until October 30. The district court granted the continuance and denied the motion to strike. Yet, Ashlock notes, the government's October 30 disclosure was incomplete--it

revealed each expert's qualifications but only included a copy of one of the three experts' reports--and the government did not provide supplemental information until January 4, one week before trial. This supplemental disclosure contained the other two experts' reports, which listed their opinions on the substances they tested and included copies of their actual test results, as well as hundreds of pages of test results from the first expert witness. Based on this sequence of events, Ashlock claims on appeal that the district court erred in denying his subsequent motion to strike the experts' testimony both because the supplemental disclosure did not provide detailed protocols of the tests employed by the forensic experts and because, even if the disclosures were sufficiently detailed, he was prejudiced by receiving the required information less than a week before trial.

We review a district court's evidentiary rulings, including its "remedies for alleged discovery violations," for an abuse of discretion. United States v. Smith, 354 F.3d 390, 397 (5th Cir. 2003). In addition, "our cases consistently have required a showing of prejudice to the substantial rights of the defendant before reversing because of an error in administering the discovery rules." United States v. Garcia, 917 F.2d 1370, 1374 (5th Cir. 1990) (citation and quotation marks omitted). Under Rule 16(a)(1)(F)-(G), the government "must permit a defendant to inspect and to copy or photograph the results or reports of . . . any scientific test or experiment" that the government

6

"intends to use . . . in its case-in-chief at trial" and it must provide a summary of each expert's testimony, which "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Rule 16(a) does not instruct the government to provide detailed step-by-step information regarding the routine protocols employed by the expert in performing the tests discussed in the report, however. Therefore, we hold that the district court did not abuse its discretion in concluding that the government's disclosures satisfied Rule 16(a). See United States v. Price, 75 F.3d 1440, 1444-45 (10th Cir. 1996) (discussing Rule 16(a)(1)(D), which became Rule 16(a)(1)(F) under the 2000 amendments to the Criminal Rules); United States v. Iglesias, 881 F.2d 1519, 1522-23 (9th Cir. 1989); cf. United States v. Berry, 670 F.2d 583, 605-06 (5th Cir. Unit B 1982) (refusing to require disclosure of the government's "Analytic Manual" for testing chemical substances).

Moreover, even if we were to conclude that the district court abused its discretion in allowing the government to delay fulfilling its obligations under Rule 16(a) until a week before trial, Ashlock has not demonstrated that he was prejudiced by the timing of the disclosures. See, e.g., United States v. Mendoza, 244 F.3d 1037, 1047 (9th Cir. 2001) ("The prejudice that must be shown to justify reversal" in these circumstances "is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the

7

evidence [been] suppressed." (emphasis added) (citation and quotation marks omitted)).  Importantly, Ashlock's claim that his receipt of this material within a week of trial was debilitating to his defense is belied both by his failure to request a continuance, see, e.g., United States v. Ivy, 83 F.3d 1266, 1281 (10th Cir. 1996), and by his attorney's ability to conduct a detailed cross-examination of each of the government's experts at trial, see United States v. Koopmans, 757 F.2d 901, 906 (7th Cir. 1985).  Additionally, although the district court had granted Ashlock's pre-trial request for funds to hire a witness with expertise in chemical analysis, Ashlock did not call an expert witness at trial to cast doubt either on the government experts' testing procedures or on their identification of the seized substances.  See Price, 75 F.3d at 1446 (finding it "implausible that [the defendant] suffered prejudice" from a Rule 16(a) violation since "[h]e was free to develop his own expert testimony" but chose not to do so).  Thus, we decline to reverse Ashlock's conviction on this basis.

In the alternative, Ashlock argues that the government's expert-witness testimony was unreliable and should have been excluded under FED. R. EVID. 702.  Rule 702 "imposes a special obligation on a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).

8

We have explained that the district court enjoys wide latitude in assessing the reliability of an expert's testimony and may consider a number of factors, including "whether a theory or technique can be or has been tested, has been subjected to peer review, has received general acceptance, and the technique's known or potential error rate." United States v. Norris, 217 F.3d 262, 269 (5th Cir. 2000).

Ashlock's main critique of the government's forensic testimony centers on the experts' failure to disclose the protocols they followed in testing the substances they identified as contraband, rendering it impossible for anyone other than a chemist to examine the test results independently and reach a conclusion regarding the identity of the substances tested. Nothing in Rule 702 requires an expert to provide this level of detail, however. Instead, Rule 702 simply dictates that the party presenting the expert testimony must show by a preponderance of the evidence that the testimony is reliable. See United States v. Fullwood, 342 F.3d 409, 412 (5th Cir. 2003). At trial, the government met this burden by eliciting testimony revealing that: (1) each expert held a bachelor's degree in chemistry and had extensive on-the-job training in forensic chemistry; (2) each of the tests performed by the experts was generally accepted in the field of forensic chemistry; (3) each of the tests was performed in accordance with the standard procedures used in the laboratory; and (4) each expert had his or

her results reviewed by another chemist in the laboratory or by a laboratory administrator. Based on this evidence, we hold that the district court did not abuse its discretion in admitting the government's expert-witness testimony under Rule 702.[2]

In his second claim of error, Ashlock argues that the district court should have stricken the testimony of Tommy Browning, a lay witness, regarding methods of manufacturing methamphetamine. Ashlock does not deny that Browning had

---

[2]    Ashlock's arguments regarding individual aspects of the experts' testimony also lack merit. He claims, for example, that some of the experiments performed on the seized substances were merely preliminary in nature and therefore inherently unreliable. Yet, as the forensic experts explained at trial, the generally accepted practice announced by the American Society of Crime Laboratories involves a series of two tests to identify narcotics: a preliminary and a confirmatory test. Because the experts testified that confirmatory tests were used to verify the results of each preliminary test, we agree with the district court that these experiments met the standard of Rule 702.

Moreover, we reject Ashlock's contention that one expert's testimony regarding the <u>theoretical</u> yield of methamphetamine that could have been produced from the pseudoephedrine tablets seized at one of his residences should have been stricken because the calculation did not reveal the <u>actual</u> amount of methamphetamine Ashlock himself would have produced. This evidence was only relevant to the drug quantity alleged in count 1 of the indictment: conspiracy to manufacture more than 500 grams of methamphetamine. Yet the record contained ample evidence, aside from the theoretical-yield testimony, from which the jury could infer that Ashlock was involved in a conspiracy to manufacture more than 500 grams of methamphetamine. For example, one witness testified that he had seen Ashlock "cook" methamphetamine, had sold Ashlock thousands of pseudoephedrine pills, and had purchased more than ten pounds of methamphetamine from Ashlock during the time period alleged in the indictment. Therefore, regardless of whether the expert's theoretical-yield testimony met the standard in Rule 702, we need not reverse Ashlock's conviction because the error (if any) was harmless. See Norris, 217 F.3d at 278 (applying harmless error); cf. United States v. Cavely, 318 F.3d 987, 998 n.3 (10th Cir. 2003).

personal knowledge of these matters but instead claims that Browning's testimony involved specialized knowledge outside the province of the jury and, thus, the government should have been required to designate Browning as an expert witness and to fulfill the disclosure requirements in FED. R. CRIM. P. 16(a). In support, he observes that the Advisory Committee to the 2000 Amendments to Federal Rules of Evidence expressly observed that a lay witness might properly testify "that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established," but "[i]f . . . that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702." FED. R. EVID. 701 advisory committee's note (citing United States v. Figueroa-Lopez, 125 F.3d 1241 (9th Cir. 1997)).

This court reviews a district court's decision whether a witness must be designated as an expert for an abuse of discretion. United States v. Griffin, 324 F.3d 330, 347 (5th Cir. 2003). Under the Advisory Committee's interpretation of Rule 701, the court should not have admitted Browning's testimony regarding methods of methamphetamine manufacturing without first qualifying him as an expert witness. We need not decide whether to adopt the Advisory Committee's position, however, because we conclude the district court's error, if any, was harmless. See United States v. Griffith, 118 F.3d 318, 323 (5th Cir. 1997).

11

The potentially objectionable portions of Browning's testimony--e.g., his discussion of the relative benefits of the red phosphorus manufacturing method--were cumulative of testimony proffered by the government's properly designated expert witness, DEA Agent Rick Smith. See Griffin, 324 F.3d at 348 ("Where objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless.").

Ashlock attempts to circumvent a finding of harmless error by arguing that only Browning, and not Agent Smith, offered evidence personally linking Ashlock to methamphetamine manufacturing. But, Browning's testimony that he had sold Ashlock thousands of pseudoephedrine pills and that he witnessed Ashlock "cooking" methamphetamine was well within the bounds of permissible lay witness testimony, even under the Advisory Committee's interpretation of Rule 701. See FED. R. EVID. 701 advisory committee's note ("[Only the parts] of a witness' testimony that [are] based upon scientific, technical, or other specialized knowledge . . . [are] governed by the standards of Rule 702 and the corresponding disclosure requirements [of FED. R. CRIM. P. 16].").

Ashlock's remaining arguments about the district court's evidentiary rulings involve the admission, over Ashlock's objections, of several items of (what he categorizes as) hearsay or irrelevant evidence. For example, he claims that the district court should have excluded (1) two maps used by law enforcement

12

witnesses to describe the events surrounding Ashlock's commission of two traffic violations and (2) various false identification papers and other documents seized from the Desdemona residence and from a nearby car.  Ashlock argues, in a conclusory fashion, that he was prejudiced by the admission of these items.  But, he makes no attempt to demonstrate how, "in light of all of the evidence," the objected-to items "actually contributed to the jury's verdict."  United States v. Cantu, 167 F.3d 198, 206 (5th Cir. 1999).  We are unable to comprehend how these maps and assorted documents could have tainted the jury's verdict on the charges at issue in the case, especially considering the voluminous evidence adduced at trial regarding Ashlock's drug possession and methamphetamine-manufacturing activities.  Accordingly, the district court's error in admitting these items, if any, was harmless.

B.   *Judgment of Acquittal*

Ashlock also argues that there was insufficient evidence to sustain the charges in counts 1 and 3 of the indictment and that the district court erred in not granting his motion for judgments of acquittal.  We review the district court's denial of a judgment of acquittal de novo.  United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998).  "In doing so, we consider the evidence, all reasonable inferences drawn from it and all credibility determinations in the light most favorable to the

13

Government, and affirm if a reasonable jury could find the offense's essential elements beyond a reasonable doubt." Id.

To establish Ashlock's guilt on count 1--conspiracy to manufacture more than 500 grams of methamphetamine--the government was required to prove beyond a reasonable doubt that an agreement existed between two or more persons to manufacture methamphetamine and that Ashlock both knew of and voluntarily participated in the conspiracy. See id.; United States v. Gibson, 55 F.3d 173, 181 (5th Cir. 1995). Ashlock does not argue that there was insufficient evidence for a jury to find that a conspiracy to manufacture methamphetamine existed or that he knew about this conspiracy. Rather, he claims that the government failed to prove that he voluntarily participated in the conspiracy. We disagree. At trial, the government adduced evidence: that Ashlock resided at the Carl C. Senter and Desdemona residences; that drug manufacturing paraphernalia was seized from each residence; that Ashlock informed DEA Agents in April 2002 that he planned to manufacture methamphetamine; and that at least one eyewitness had personally seen Ashlock manufacture methamphetamine on more than one occasion. Viewed in the light most favorable to the government, this evidence was sufficient to prove beyond a reasonable doubt that Ashlock voluntarily participated in a conspiracy to manufacture methamphetamine.

Nevertheless, Ashlock argues that the government's evidence

14

does not specifically demonstrate that he participated in the drug conspiracy between September 2001 and August 3, 2002--the time period alleged in the indictment. However, the evidence we have outlined above places Ashlock's participation in the manufacturing conspiracy within the relevant time frame. Moreover, to the extent that the government's evidence might be construed to include events occurring more than a year before the earliest date charged in the indictment, as Ashlock claims, this flaw is not fatal to the government's case. As we explained in United States v. Lokey, 945 F.2d 825 (5th Cir. 1991):

> [A]n allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient. . . . When conspiracy is charged, an indictment satisfies the requirements of the statute of limitations if the government alleges and proves, at trial or pretrial, that the conspiracy continued into the limitations period.

Id. at 832 (alteration in original) (citation and internal quotation marks omitted). Therefore, because there was evidence that the conspiracy continued through the time stated in the indictment, the district court did not err in denying his motion for acquittal on count 1.

To convict Ashlock on count 3--being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)--the government was required to prove beyond a reasonable doubt that (1) Ashlock was a convicted felon, (2) who possessed a firearm, and (3) the firearm was in or affected interstate commerce. See

15

United States v. Fields, 72 F.3d 1200, 1211 (5th Cir. 1996).
Ashlock admits that he was a convicted felon but avers that the government adduced insufficient evidence to prove the second and third elements of this crime. After reviewing the record, we find both arguments legally untenable.

To satisfy the second element, the government presented two witnesses who testified that Ashlock lived in the Desdemona residence where the firearms were discovered. One witness also testified that he had seen Ashlock with a shotgun and a pistol in his home. This evidence was sufficient to demonstrate, at a minimum, Ashlock's constructive possession of the firearms. See United States v. Smith, 930 F.2d 1081, 1085 (5th Cir. 1991) (requiring proof of "ownership, dominion, or control over the [firearm] itself, or dominion or control over the premises in which the [firearm] [was] concealed" (internal quotation marks omitted)). Moreover, although Ashlock implies that he was not the sole inhabitant of the house where the guns were seized, the government's evidence that the shotgun was found in plain view by the back door of the house is legally sufficient to sustain the charge under § 922(g)(1). See Fields, 72 F.3d at 1212 (holding, in a case where the defendant jointly occupied a home, that "the fact that the shotgun was found in plain view, leaning against a wall, is sufficient to establish" constructive possession).

Similarly, the government produced sufficient evidence from which a reasonable jury could conclude, beyond a reasonable

16

doubt, that the firearms possessed by Ashlock affected interstate commerce. Under this circuit's precedents, the government may establish the interstate commerce element of § 922(g)(1) through testimony "that the firearms were manufactured outside of Texas and traveled in interstate commerce to reach Texas." Fields, 72 F.3d at 1211. At trial, a government expert testified that the Ithaca shotgun could only have been manufactured in New York and the Jennings pistol could only have been manufactured in California; thus, both firearms must necessarily have crossed state lines to arrive at the Desdemona Street residence in Texas. Accordingly, the district court did not err in denying Ashlock's motion for judgment of acquittal on count 3.

*C.    Public Authority Jury Instruction*

Ashlock argues that the district court erred in denying his request for a public authority jury instruction. We review the district court's refusal to provide a jury instruction for an abuse of discretion. See United States v. Treviño-Martinez, 86 F.3d 65, 67 (5th Cir. 1996). "A conviction cannot be overturned for failure to instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to acquittal." United States v. Spires, 79 F.3d 464, 466 (5th Cir. 1996).

The "'public authority' defense . . . requires a defendant to show that he was engaged by a government official to

17

participate in covert activity." United States v. Fox, 248 F.3d 394, 408 (5th Cir. 2001) (citing Spires, 79 F.3d at 466 n.2), vacated on other grounds, 535 U.S. 1014 (2002).  Ashlock believes that he satisfied this burden and points to his agreement with the local drug task force, which he signed on December 2001, as evidence of his authority to carry firearms, illegally possess pseudoephedrine, and manufacture methamphetamine.  But the confidential agreement, which was introduced by the government at trial, included the following statements (all of which were initialed by Ashlock):

> I . . . understand that I am not to carry a firearm or weapon of any type while working with the NADITF.
> . . .
> I further understand that I may not engage in any illegal or improper conduct so long as I am working with the NADITF.
> . . .
> Further, I understand that any violations arising from my action in violation of the aforementioned circumstances will result in an investigation of the matter.  If the charges are substantiated, appropriate action, to include the possibility of criminal prosecution, will be taken.

As these provisions make clear, Ashlock could not have reasonably believed, based on this agreement, that he was authorized to engage in the criminal activities for which he was charged.  Cf. Spires, 79 F.3d at 466 n.2 (explaining, in dicta, that a defendant who was charged with illegally possessing a firearm "prudently d[id] not raise a . . . defense of acting under public authority" since his confidential informant agreement contained the condition that he "not carry a firearm").  Because Ashlock

18

does not identify any other evidence that might support an inference that he was authorized to engage in criminal activities as a task-force confidential informant, we conclude that the district court did not abuse its discretion in denying Ashlock's request for a public authority jury instruction.

D.    *Application of the Sentencing Guidelines*

Finally, Ashlock contends that the district court violated his Fifth Amendment right to due process and his Sixth Amendment right to a trial by jury when it enhanced his sentence under the Federal Guidelines based on factors found by the judge based on a preponderance of the evidence, not by the jury under a reasonable doubt standard. In particular, he argues that the judge should not have enhanced his sentence (1) by two levels for recklessly fleeing from the police on August 3, 2002, in a black pickup truck, see U.S.S.G. § 3C1.2; (2) by three levels for creating a substantial risk of harm to human life and the environment through his methamphetamine manufacturing, see id. § 2D1.1(b)(5)(B); and (3) by two levels for obstructing justice by asking a witness not to cooperate fully with the government, see id. § 3C1.1.

The government contends that we must apply a plain error standard of review because Ashlock did not object, on these grounds, during the sentencing proceedings. We disagree. Before trial, Ashlock filed an "Advance Notice of Difficult Questions"

19

in which he argued that the government should not be permitted to seek enhancement of his sentence based on any fact not "properly pleaded in the superseded [sic] indictment." He argued, under Apprendi v. New Jersey, 530 U.S. 466 (2000), that any fact used to increase his sentence had to be submitted to a jury and proved beyond a reasonable doubt. Because the district court rejected this argument without indicating a willingness to reconsider the issue at sentencing, we conclude that Ashlock has properly preserved this issue for appeal. See United States v. Hopkins, 433 F.2d 1041, 1044 (5th Cir. 1970); cf. Bender v. Brumley, 1 F.3d 271, 277 (5th Cir. 1993) ("We recognize that error is preserved for appeal so long as the complaining party states his assertion to the trial court prior to the time when the court invites on-the-record objections to the charge.").

Nevertheless, even under a harmless-error standard, we hold that Ashlock's argument is foreclosed by this court's precedents. As we recently explained in United States v. Pineiro, No. 03-30437, 2004 WL 1543170 (5th Cir. July 12, 2004), "[j]udicial findings under the Guidelines that set sentences within [the range authorized by the United States Code] . . . do not offend the Constitution." Id. at *9. Therefore, because Ashlock's sentence under each count of the indictment did not exceed the maximum penalty authorized by the United States Code, the district court's application of the Federal Guidelines to enhance Ashlock's sentence was not constitutionally infirm.

20

## III. CONCLUSION

Accordingly, we AFFIRM district court's judgment and sentence.